## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| **ANDREW GODDARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **07-10705-FDS** |
| | ) | |
| **WILLIAM J. KELLEY, DANIEL** | ) | |
| **HUMPHREYS, and THOMAS MANNING,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

_____

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a civil rights action arising out of the ejection of a fan from a Red Sox playoff game. Plaintiff Andrew Goddard attended Game Five of the 2004 American League Championship Series at Fenway Park between the New York Yankees and the Boston Red Sox. He was ejected after loudly, and obscenely, protesting the umpire's call when David Ortiz was thrown out attempting to steal second base in the bottom of the twelfth inning. He contends that after his ejection he was physically assaulted and arrested without probable cause by three Boston police officers, defendants William J. Kelley, Daniel Humphreys, and Thomas Manning.

The complaint includes seven counts: a claim under 42 U.S.C. § 1983 for violation of the Fourth Amendment by means of the use of unreasonable force (Count 1); a claim under § 1983 for violation of the Fourth Amendment by means of an arrest without probable cause (Count 2); a claim under the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I (Count 3); a claim

for assault and battery (Count 4); a claim for false imprisonment (Count 5); a claim for malicious

prosecution (Count 6); and a negligence claim against the City of Boston (Count 7).

All defendants separately moved for summary judgment on all claims.[1]  For the reasons set

forth below, the motions will be denied in part and granted in part.

The result of the Court's decision is, for the most part, to deny summary judgment and

permit the matter to proceed to trial.  In making that decision, it has viewed the evidence, as it

must, in the light that is most favorable to the plaintiff.  The Court does not, however, mean to

suggest that it endorses the actions of the plaintiff.  Andrew Goddard admits that he stood up at

Fenway Park during a baseball game, extended his two middle fingers, and shouted, "Fuck you!

You suck!"   He also admits that he initially refused to leave his seat when he was ejected.  It is an

unfortunate fact of modern life that obscene, ugly, and often dangerous behavior by spectators is a

routine part of sporting events.  Nonetheless, plaintiff here has made serious accusations of police

misconduct, including an unprovoked physical assault, and his own misbehavior does not preclude

him from asserting such a claim.

I.    **Statement of Facts**

The facts are stated in the light most favorable to the plaintiff unless otherwise noted.

A.    **The 2004 ALCS**

In October 2004, the Boston Red Sox staged the most dramatic comeback in baseball

history.  Trailing three games to none in the American League Championship Series against the

New York Yankees, and trailing 4-3 in the ninth inning in Game Four, the Red Sox rallied to tie

the game in the ninth, and won it in extra innings.  The Red Sox went on to win the next three

---

[1] Defendant the City of Boston was dismissed by stipulation of the parties on August 4, 2008.

games to defeat the Yankees and to sweep the St. Louis Cardinals in the World Series.[2]

The Red Sox lost the first three games of the ALCS, the third by the score of 19-8.  Game Four was played at Fenway Park in Boston.  In the bottom of the ninth, the Red Sox scored a run off Yankees reliever Mariano Rivera to tie the game, and won it in the twelfth inning on a home run by David Ortiz.  The game ended after 1:30 a.m.

Game Five began at 8:10 p.m. the next evening, October 18, 2004, in Boston.

### B.      Goddard's Behavior During the Game

Plaintiff Andrew Goddard attended Game Five at Fenway Park.  (Pl. Dep. at 18:12-16, 19:2-5).  He was seated with his brother, Matthew Goddard, in a section of seats at field level just beyond first base.  (Pl. Dep. at 18:21-23).  The stadium was filled to capacity.  (Pl. Dep. at 29:2-10).

The Red Sox scored two runs in the eighth inning to tie the game, one of which came on a David Ortiz home run.  The game remained tied into the bottom of the twelfth inning when Ortiz drew a walk with one out.  By that point, Game Five, the start of which had been delayed until 8:10 p.m., had already extended into the early morning hours of October 19.[3]

With two balls and one strike on the next batter, Doug Mienkiewicz, Ortiz attempted to steal second base.  (Pl. Dep. at 26:16-18).[4]  As the pitch was thrown and Ortiz began running,

---

[2] The Red Sox victory in the World Series was their first since 1918, a drought of 86 years between championships.  The Red Sox had lost the ALCS to the Yankees the prior year when Aaron Boone homered off Tim Wakefield in the eleventh inning of Game Seven.

[3] The Red Sox went on to win the game in the fourteenth inning when Ortiz hit a single to center field, scoring Johnny Damon from second base.

[4] Ortiz had not attempted a stolen base since the 2002 regular season.

3

Andrew and his brother, as well as the other fans seated in their section and the rest of the stadium, rose to their feet.  (A. Goddard Dep. at 30:10-24).  Ortiz and the throw from the catcher arrived at second base simultaneously, Yankees shortstop Derek Jeter applied the tag, and the umpire called Ortiz out.  (Pl. Dep. at 26:14-17).  The hometown crowd went into an uproar, booing and yelling with displeasure.  (Pl. Dep. at 26:19-22).  Ortiz also began arguing with the second base umpire.  (Pl. Ex. K.).

Upon seeing the play and the reaction of Ortiz, Andrew Goddard stood up.  He extended both his arms with his middle fingers upraised in the direction of the second base umpire and yelled, "Fuck you! You suck!"  (Pl. Dep. at 27:17-24, 28:1-22).[5]

Andrew's outburst caught the attention of the first-base umpire, who was standing on the field in close proximity to Andrew's seat.  (Pl. Dep. at 29:24, 30:1-3).  The umpire immediately looked in Andrew's direction.  (Pl. Dep. at 30:1).  According to Andrew, he quickly returned to his seat and resumed watching the game.  (Pl. Dep. at 30:9-24).  The first-base umpire then approached security supervisor William Mullaly, who was nearby, and instructed him to eject both Andrew and Matthew Goddard.  (Mullaly Dep. at 39:7-15).  Mullaly went to Boston Police Detective William J. Kelley and Officer Daniel Humphreys, who were assigned to a security detail at Fenway Park, and requested their assistance in carrying out the ejection.  (Mullaly Dep. at 39:8-12).

Detective Kelley contends that he witnessed Andrew's outburst.  (Kelley Dep. 25:5-13).[6]

---

[5] Neither party raises the issue of alcohol consumption by the Goddards.  According to Andrew, he consumed three to four cups of beer over the course of the game.  (Pl. Dep. 24:14-24).

[6] Kelley testified that he heard defendant yell, "Fuck you! You suck!"  He looked up to see plaintiff standing with his middle fingers extended out toward the umpire.  He then saw Matthew stand up, extend his

### C.     Goddard's Ejection from Fenway Park

Detective Kelley accompanied Mullaly to the aisle nearest to the point where Andrew and Matthew Goddard were sitting.  (Mullaly Dep. at 40:13-21).  Kelley informed them that if they did not leave the game, they would be arrested.  (Pl. Dep. at 34:4-9).  According to Andrew, he believed, from prior experience observing similar incidents at Fenway Park, that the officer would issue a warning prior to ejecting a fan for swearing, so he apologized and resumed watching the game.  (Pl. Dep. at 33:20-24, 34:1-23).[7]

Andrew was told repeatedly that this was not a warning and was instructed to leave the stadium.  The two men then stood up and began making their way toward the exit.  (Pl. Dep. at 35:12-19).  According to Andrew, the two brothers realized that arguing would be futile and planned to leave quickly in hopes of finding a nearby television on which to watch the end of the game.  (Pl. Dep. at 35:12-19).  While attempting to exit his seat, Kelley grabbed Andrew by the shirt and forcefully pulled him upward, into the aisle.  (Pl. Dep. at 35:20-24).  Andrew and Matthew then began ascending the stairs of the section toward the concourse that led to the exit.  (Pl. Dep. at 42:12-13).

By the time the men reached the aisle at the end of their row of seats, Officer Daniel Humphreys of the Boston Police Department had arrived to assist Kelley.  (Pl. Dep. at 42:6-8; Kelley Dep. at 42:2-7).  Due to recent knee surgery, Andrew had trouble ascending the stairs.  (Pl. Dep at 42:12-21).  Officer Humphreys shoved Andrew in the back with every step in an

---

middle fingers, and yell, "Fuck you, you cocksucker!"  Plaintiff acknowledges that after he yelled at the umpire, "I noticed a police officer . . . more or less pointing at us . . . ."  (Pl. Dep. 34:21-23).

[7] Detective Kelley contends that plaintiff was combative, refused to leave, and repeatedly swore at the men, creating a "potential arrest situation."  (Kelley Dep. at 37:20-24, 38:1-22).

attempt to hurry him up the stairs and out of the stadium.  (Pl. Dep. at 42:20-21).  After reaching

the top of the stairs, the officers directed the men below the concourse and toward the nearest

exit.  Officer Humphreys continued to push Andrew from behind on the concourse despite the

fact that Andrew told him that he had just had knee surgery and that he was moving as fast as he

could.  (Pl. Dep. at 46:8-22).

　　　The officers then escorted the two men to an ambulance bay that the police used as a point

from which to eject fans from the stadium.  (Mullaly Dep. at 45:15-20).  The bay was arranged so

that an ambulance could be backed in through a garage door to provide first aid within the

stadium in case of an emergency.  (Kelley Dep. at 48:10-13).  The officers released the two men

in the ambulance bay and they exited the stadium through the opened garage door.  (Pl. Dep. at

51:2-10).

　　　At that point, a Red Sox security officer immediately called the men back into the stadium

and asked them for photo identification so that he could include their names in an ejection report.

(Pl. Dep. at 51:11-14).  The two men gave their driver's licenses to the security officer and waited

by the exit.  (Pl. Dep. at 58:1-2).

　　　While the two men waited for their licenses to be returned, Detective Kelley assumed an

aggressive posture, standing very close to Matthew with his hands on him.  (M. Goddard Dep. at

56:12-22).  Feeling uncomfortable, Matthew looked down and attempted to take note of Kelley's

badge number.  (M. Goddard Dep. at 55:16-17).  Kelley asked Matthew what he was looking at,

to which he replied, "I'm looking at your badge number."  (Pl. Dep. at 14-20).  At that point,

Kelley became irate, repeatedly yelling his badge number, swearing, and challenging Matthew to

hit him.  (Pl. Dep. at 56:3-13; M. Goddard Dep. at 56:5-13).  Matthew remained standing on the

6

sidewalk with his back against the brick outside wall of the stadium.  (M. Goddard Dep. at 56:22-23; Pl. Dep. at 60:1-6).

### D.     Goddard's Arrest

As the confrontation between Matthew and Detective Kelley began to escalate, Andrew became scared and nervous and attempted to remove himself from the situation.  (Pl. Dep. at 60:11-13).  He attempted to walk past Kelley toward the sidewalk on the outside of the stadium. (Pl. Dep. at 60:14-19).  After he took two or three steps in the direction of the sliding door that enclosed the ambulance bay, Kelley turned and punched Andrew in the throat.  (Pl. Dep. at 60:14-18).

Having been struck unexpectedly, Andrew grabbed his throat, stumbled backwards, and tripped over the bumper of the nearby ambulance, falling to the ground.  (Pl. Dep. at 61:17-24, 62:1-2).  As he lay on the ground gasping for air, Kelley stood over him, ordering him to get up and informing him that, if he did not, he would be arrested for trespassing.  (Pl. Dep. at 64:4-8). Andrew told Kelley that he was hurt and unable to get up. (M. Goddard Dep. at 66:7-12).

As Andrew lay face down on the pavement, Officer Humphreys jumped on his back and Detective Kelley jumped on his legs.  (Kelley Dep. at 69:22-23).  Both officers landed on Mr. him with their knees.  (Pl. Dep. at 64:12-17; Kelley Dep. at 69:23-24).  Humphreys grabbed Andrew's hands, which were still clutching his throat, brought them behind his back, and secured them in handcuffs.  (Pl. Dep. at 64:16-17).

The role of Sgt. Thomas Manning in the arrest is unclear.  In their depositions, both Andrew and Matthew testified that Manning did not arrive on the scene until after Andrew was handcuffed.  Neither Andrew or Matthew testified that Manning said anything to Andrew while he

was on the ground.[8]

Andrew sustained an injury to his knee during the arrest.  (Pl. Dep. at 66:13-15).
Although he informed them that his knee was injured, that he was unable to get up, and that he
needed help, the officers forced him to his feet and into a police wagon, and refused to provide
him medical assistance.  (Pl. Dep. at 76:3-22).  Finally, after he was processed and placed in a
holding cell at the police station, EMTs arrived.  (Pl. Dep. at 77:1-4).  Rather than treat him, the
EMTs simply threw ice packs through an access panel in his cell, allowing him to place ice on his
knee which, by that point, had swollen to the size of a grapefruit.  (Pl. Dep. at 98:6-14).

### E.      Goddard's Acquittal on Criminal Charges

Andrew and Matthew were charged in a criminal proceeding with five crimes: trespassing,
assault and battery on a police officer, resisting arrest, disorderly conduct, and disturbing a public
assembly. Kelley signed the criminal complaint.  In February 2006, after a jury trial, the Goddards
were acquitted on all charges.

## II.      Analysis

Summary judgment is appropriate when "the pleadings, the discovery and disclosure
materials on file, and any affidavits show that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine

---

[8] According to the depositions of the defendants—with which the plaintiff's statement of facts generally
agrees—either Kelley or Humphreys called for a supervisor.  (Humphreys Dep. 79:16-24).  When Manning
arrived, according to the defendants,  he spoke to Kelley and then introduced himself to Andrew and informed him
that he was being thrown out and that he was subject to arrest if he did not get up and leave the stadium.  (Kelley
Dep. at 68:18-23).  Andrew, who was still on the pavement, replied that he had been punched in the throat by
Kelley as he was attempting to exit the stadium.  (Kelley Dep. at 69:6-9).  Andrew also said that he had a bad knee
and could not get up.  (Manning Dep. at 29).  Manning said that he would help Andrew get up, but Andrew would
have to leave the stadium or he would be arrested for trespass.   Andrew began defiantly swearing at Manning.
(Manning Dep. 29:7-15).  When Andrew did not stand up, Manning told Kelley and Humphreys to arrest him for
failing to cooperate.  (Kelley Dep. at 69:14-16).

issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990).

## A.   <u>Federal Claims</u>

Plaintiff has asserted two claims under 42 U.S.C. § 1983, both involving alleged violations of his Fourth Amendment rights:  one alleging the use of unreasonable or excess force and one alleging unlawful arrest.  Defendants contend that the evidence is insufficient to support either claim and that, in any event, they are entitled to qualified immunity as to both.

## 1.   <u>Excessive Force (Count 1)</u>

Plaintiff alleges that Kelley used excessive force when he punched him in the neck, and that both Kelley and Humphreys used excessive force when arresting and handcuffing him.[9]  He contends that the level of force used by the officers violated his rights under the Fourth Amendment.

Excessive force claims arising out of arrests are analyzed under the Fourth Amendment's protection against unreasonable seizures.  *Bastien v. Goddard*, 279 F.3d 10, 14 (1st Cir. 2002), citing *Graham v. Connor*, 490 U.S. 386 (1989).  The right to make an arrest carries with it the right to use some degree of force.  *See Graham*, 490 U.S. at 396.  Only excessive force is actionable; "not every push or shove rises to the level of a constitutional violation."  *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 205 (1st Cir. 1990).

Claims of excessive force are judged against an "objective reasonableness" standard.  *Id.* at 388.  The reasonableness of the force is determined by balancing the level of force used with

---

[9] Manning is not named as a defendant in Count 1.

the government's interest in public safety.  *Id.* at 396.  The government's interest is not judged

with the benefit of hindsight; rather, it is "the perspective of a reasonable officer on the scene" at

the time.  *Id.*  Therefore, depending on the officer's real-time understanding of the severity of the

suspected offense, the potential danger the suspect poses to the officer and the public, and

whether or not the suspect is actively resisting arrest, more or less force may be objectively

reasonable in any given case.  *Id.  See also Bastien* , 279 F.3d at 14.  The officer's subjective

intent or motivation is not relevant to the reasonableness inquiry.  *Bastien*, 279 F.3d at 14, citing

*Alexis v. McDonald's Rests. of Mass.*, 67 F.3d 341, 352 (1st Cir. 1995).

For purposes of summary judgment, the Court must credit plaintiff's version of events.

According to plaintiff, he had agreed to leave the stadium peaceably; he had, in fact, done so; he

was asked to return briefly by a stadium security officer to show his driver's license; during that

process, Kelley unreasonably provoked a confrontation with his brother Matthew; Kelley, without

warning or provocation, then struck plaintiff in the neck; the punch rendered him immobile; Kelley

then threatened him with arrest if he did not leave; and despite his immobility and lack of

resistance, Kelley and Humphreys jumped on him with their knees in his back.  That evidence, if

credited, is clearly sufficient to sustain a claim for excessive force.  Accordingly, summary

judgment will be denied as to Count 1.[10]

## 2.   Unlawful Arrest (Count 2)

Plaintiff further alleges that defendants did not have probable cause to arrest him, and that

---

[10] Defendants contend that even if plaintiff's version of the facts were true, he cannot establish an excessive force claim because he did not sustain any serious injuries.  Defendants point out that plaintiff did not seek medical assistance for any injury that he contends resulted from the incident.  However, a plaintiff may prevail on a § 1983 claim for excessive force despite suffering only minor injuries as a result of the alleged police misconduct.  *See Bastien*, 279 F.3d at 14-15.

therefore the arrest constituted a violation of his Fourth Amendment rights.  A warrantless arrest

by a law enforcement officer is reasonable under the Fourth Amendment where there is probable

cause to believe that a criminal offense has been or is being committed.  *Devenpeck v. Alford*, 543

U.S. 146, 152 (2004).

Whether the arresting officers had probable cause is "not necessarily based upon the

offense actually invoked by the arresting officer but upon whether the facts known at the time of

the arrest objectively provided probable cause to arrest."  *United States v. Jones*, 432 F.3d 34, 41

(1st Cir. 2005), citing *Devenpeck v. Alford*, 543 U.S. at 153.  The probable cause inquiry is an

objective standard.  *Id*.  It is thus "irrelevant" that the police officers subjectively believed, or told

plaintiff at the time, that they were making the arrest for a particular offense.  *Id.*[11]

According to the defendants, plaintiff and his brother were arrested for trespassing

because they refused to leave Fenway Park after they had been ejected.  (Manning Dep. at 29;

Kelley Dep. at 38).  A person is guilty of criminal trespass if he "without right enters or remains

on [the property] of another . . . after having been forbidden so to do by the person who has

lawful control of said premises, whether directly or by notice posted thereon . . . ."  *See* Mass.

Gen. Laws ch. 266, § 120.

Defendants contend that even if they did not have probable cause to arrest plaintiff for

trespassing, they nonetheless had probable cause to arrest him for any of three misdemeanor

offenses.  Specifically, defendants contend that when plaintiff shouted "Fuck you! You suck!" at

---

[11] It is also irrelevant, in determining whether the arrest was lawful, that the plaintiff was later acquitted
of the crimes for which he was arrested.  *See United States v. Brown*, 169 F.3d 89, 92 (1st Cir. 1999).  The inquiry
focuses solely on the facts the officers knew at the time of the arrest and whether those facts constituted probable
cause.  *Id.* at 91.

the umpire, he committed the offenses of disorderly conduct,[12] directing obscene language to a sporting event official,[13] and disrupting a public assembly.[14]  For these purposes, the Court will assume that those violations occurred.[15]

"If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."  *Atwater v. City of Largo Vista*, 532 U.S. 318, 354 (2001).  Even an arrest that violates state law does not result in a *per se* violation of the plaintiff's right to be free from

---

[12] Mass. Gen. Laws ch. 272, § 53 provides:

> Common night walkers, common street walkers, both male and female, common railers and brawlers, persons who with offensive and disorderly acts or language accost or annoy persons of the opposite sex, lewd, wanton and lascivious persons in speech or behavior, idle and disorderly persons, disturbers of the peace, keepers of noisy and disorderly houses, and persons guilty of indecent exposure may be punished by imprisonment in a jail or house of correction for not more than six months, or by a fine of not more than two hundred dollars, or by both such fine and imprisonment.

[13] Mass. Gen. Laws ch. 272, § 36A provides:

> Whoever, having arrived at the age of sixteen years, directs any profane, obscene or impure language or slanderous statement at a participant or an official in a sporting event, shall be punished by a fine of not more than fifty dollars.

[14] Mass. Gen. Laws ch. 272, § 40 provides:

> Whoever wilfully interrupts or disturbs a school or other assembly of people met for a lawful purpose shall be punished by imprisonment for not more than one month or by a fine of not more than fifty dollars...

[15] Plaintiff argues that Mass. Gen. Laws ch. 272, § 36A is unconstitutional because it clearly violates the First Amendment.  Defendants do not defend the statute, but instead respond with a qualified immunity defense. They argue that even if the First Amendment jurisprudence strongly suggests that § 36A is invalid, it has never been actually invalidated by any court, and therefore the officers were entitled to rely on its validity to arrest plaintiff.  Their position is somewhat ironic, given that defendants did not rely on § 36A when arresting plaintiff, and in fact, did not raise the statute as an alternate source of probable cause until summary judgment proceedings almost four years later.  In any event, the Court does not need to decide the issue.

unreasonable seizure. *See Vargas-Badillo v. Diaz-Torres*, 114 F.3d 3, 6 (1st. Cir. 1997).[16] For the purposes of an unlawful arrest claim under the Fourth Amendment, the only relevant inquiry is whether there was probable cause that any arrestable offense was committed. *See Jones*, 432 F.3d at 41.

At first blush, therefore, it would appear that plaintiff's claim for false arrest must necessarily fail. At a minimum, there was probable cause to arrest plaintiff under at least one of the misdemeanor statutes based on his outburst in the stadium.[17] Whatever subjective motives the officers may have had, they are, for these purposes, irrelevant.

The problem with that analysis, however, is that it ignores several critical facts. As noted above, plaintiff was *not* arrested at his seat, or in the aisle, or when he first arrived at the ambulance bay. Instead, he was arrested after the police had let him go, and after he had left the stadium. He had only returned to the stadium because he had been asked to come back in to provide identification to a Red Sox security officer. Furthermore, and most critically, he was arrested only after Kelley had rendered him immobile with a punch to the neck, and after Kelley then threatened him with arrest if he failed to leave. There are thus at least two issues that take

---

[16] Under Massachusetts law, a police officer may arrest a suspect who (1) commits a misdemeanor involving a breach of the peace, (2) in the presence or view of the officer, (3) if the commission of the crime is "still continuing at the time of the arrest or only interrupted, [such] that the offense and the arrest form parts of one transaction." *Commonwealth v. Gorman*, 288 Mass. 294, 297 (1934) (citations omitted). *See also* Mass. Gen. Laws ch. 231, § 94A. If the statute criminalizing an act provides explicit authority for a warrantless arrest, those limitations do not apply. *Gorman*, 288 Mass. at 297.

Kelley witnessed plaintiff's outburst, and thus the offenses were committed in his presence. However, because plaintiff was arrested after he had left the stadium, any misdemeanor was not "continuing" at the time of the arrest, and thus the arrest was apparently invalid under Massachusetts law to the extent it was based on any misdemeanors.

[17] The issue of probable cause to prosecute under ch. 272, § 40 (disturbing a public assembly) and ch. 272, § 53 (disorderly conduct) is addressed below.

13

this case outside the normal analytical framework.

First, between the time of the initial incident (plaintiff's outburst) and the arrest, the police had made a conscious decision *not* to arrest plaintiff, and to let him go.  But for the intervention of the Red Sox security officer (who requested that he return to the stadium) and the police themselves (who then started an altercation), the episode would have ended at that point.  Once the police decided to let him go, their right to make a *warrantless* arrest had dissipated; there was no exigency at that point necessitating such an arrest.  The validity of the subsequent arrest must be judged according to the new circumstances.  *See Knowles v. Iowa*, 525 U.S. 113 (1998).[18]  Put another way, the police made two decisions:  a decision not to make a warrantless arrest based on the incident in the seating area, and a subsequent decision to make a warrantless arrest based on the incident in the ambulance bay.  It is not the lapse of time that is significant, but the break in continuity and causation:  the first incident had effectively ended with the decision to release the plaintiff, and a new incident had begun.

Second, the police themselves created the "probable cause" for which plaintiff was arrested.  Common sense would suggest that a police officer cannot (1) render a person immobile through physical force and (2) arrest that person for "remaining" on the property while he is rendered immobile.  To state it another way, it is objectively unreasonable for a police officer to

---

[18] In *Knowles*, police officers witnessed Knowles commit a violation of traffic laws and made a traffic stop.  Under Iowa law, the officers could either issue Knowles a citation or arrest him; they chose to issue a citation, and did so.  The officers then searched his car without his consent and found contraband.  The state argued that because the police could have arrested Knowles for the traffic violation, the search of his car was a search incident to arrest.  The Supreme Court disagreed, holding that once the officers had issued the citation to Knowles, their authority to arrest for that infraction, and thus to conduct a search incident to arrest, had expired.  Similarly, in the case at bar, once Kelley and Humphreys had released the Goddards, they no longer had the authority to arrest them for the misdemeanors the Goddards arguably committed in the presence of Kelley and Humphreys.

create the "probable cause" for an arrest by his own actions.

This case is thus distinguishable from *Devenpeck* and *Jones*.  In those cases, the officers made an arrest based on a belief that a particular criminal offense had been committed that, it was later determined, did not rise to the level of probable cause.  *See Devenpeck*, 543 U.S. at 148-150, 155 and *Jones*, 432 F.3d at 37-38.  However, the officers were aware of facts that gave them probable cause to arrest for some other offense, which satisfied the requirements of the Fourth Amendment.  Neither case involved a break in continuity such as that in the present case.  Furthermore, the purpose of the *Devenpeck* rule is to provide objective constitutional standards in the arrest process.  543 U.S. at 153-55.  As the *Devenpeck* court noted, reliance on the subjective views of the arresting police would mean that the validity of arrests would turn on the experience and training of the police officers and whether they spoke or were silent as to the reason for the arrest.  *Id.*  No such concern is present here.

Having made a decision *not* to arrest plaintiff—and thus having foregone their opportunity to make a warrantless arrest—the validity of the subsequent warrantless arrest should be judged by the objective circumstances under which that separate decision was made.  Viewed in the light most favorable to the plaintiff, there was no probable cause for that arrest, and therefore summary judgment will be denied as to Count 2.

### 3.    <u>Qualified Immunity</u>

Defendants contend that even if they behaved inappropriately, they are nonetheless protected from liability on the § 1983 claims by the doctrine of qualified immunity.[19]  The

---

[19] Whether an official's actions are protected under the doctrine is "an issue that is appropriately decided by the court during the early stages of the proceedings and should not be decided by the jury."  *Tatro v. Kervin*, 41 F.3d 9, 15 (1st Cir. 1994).

qualified-immunity doctrine shields public officials from liability for civil rights violations as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *Ringuette v. City of Fall River*, 146 F.3d 1, 5 (1st Cir. 1998). The question is not whether some right has been clearly established at a highly abstract level—for example, the right to be free from unreasonable searches and seizures—but "whether, under the circumstances that confronted the official, 'a reasonable official would understand that what he is doing violated that right.'" *Id.* (quoting *Creighton*, 483 U.S. at 640).

The qualified-immunity analysis consists of the following three inquiries: (1) "whether the plaintiff's allegations, if true, establish a constitutional violation"; (2) "whether the constitutional right at issue was clearly established at the time of the putative violation"; and (3) "whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right." *Burke v. Town of Walpole*, 405 F.3d 66, 77 (1st Cir. 2005) (quoting *Limone v. Condon*, 372 F.3d 39, 44 (1st Cir. 2004)).

If the plaintiff's version of the facts is true, defendants assaulted him without provocation, and then jumped on top of him (digging their knees into his back) to handcuff him, despite encountering no resistance to arrest. This constitutes a violation of Fourth Amendment rights to freedom from excessive force and freedom from unreasonable arrest—rights that were clearly established at the time of the encounter. The use of violence against individuals who pose no safety threat is clearly unreasonable, and that fact would have been understood by an objectively reasonable officer. *See Asociacion de Periodistas de P.R. v. Mueller*, 529 F.3d 52, 60 (1st Cir. 2008). Similarly, no reasonable police officer would believe that he could create the probable

16

cause that led to plaintiff's arrest for trespassing.  Accordingly, the doctrine of qualified immunity does not apply to the circumstances of this case.

      **B.**    **State Law Claims**

           **1.**    **Massachusetts Civil Rights Act (Count 3)**

The Massachusetts Civil Rights Act, Mass. Gen. Laws. ch. 12, § 11I, provides a right of action to any person whose exercise or enjoyment of rights secured by the federal or state constitution or laws has been interfered with by "threats, intimidation, or coercion." *See Bally v. Northeastern Univ.*, 403 Mass. 713, 717 (1989).  A "threat" means the "intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Planned Parenthood League of Massachusetts, Inc. v. Blake*, 417 Mass. 467, 474 (1994).  "Intimidation" means putting a person in fear for the purpose of compelling or deterring his or her conduct. *Id.* "Coercion" means application of physical or moral force to another to constrain him to do against his will something he would not otherwise do. *Id.*

There is no evidence supporting such a claim against defendant Manning.  Manning did not touch plaintiff during the altercation, and plaintiff has not put forward any evidence that Manning even spoke to him, much less threatened, intimidated, or coerced him.  Manning's motion for summary judgment will therefore be granted as to Count 3.

The claim against Kelly and Humphreys is likewise problematic.  On its face, the MCRA contemplates a two-part sequence:  (1) the defendant threatens, intimidates, or coerces the plaintiff, in order to (2) cause the plaintiff to give up something that the plaintiff has the constitutional right to do.  Thus, for example, the statute would apply where a defendant (1) threatened to beat up the plaintiff if (2) the plaintiff exercised his right to vote.  In the present

case, a punch to the throat or a threat of arrest would presumably qualify under the right circumstances as "threats, intimidation, or coercion."  The problem is ascertaining the constitutional rights that the assault or the threat were directed to:  what did the plaintiff give up that he had a constitutional right to do?

The two constitutional rights at stake are the right to be free from excessive force and the right to be free from false arrest.   If the statute applies, it would mean that the defendants assaulted the plaintiff in order to cause the plaintiff to give up his right to be free from excessive force, or threatened arrest in order to cause him to give up his right to be free from false arrest. Such a construction would torture the statute well beyond its plain meaning, and therefore the Court concludes that it simply does not apply to the present facts.  *See Columbus v. Biggio*, 76 F. Supp. 2d 43, 54 (D. Mass. 1999) ("a direct deprivation of rights, even if unlawful, is not coercive because it is not an attempt to force someone to do something the person is not lawfully required to do"), *citing Swanset Development Corp. v. City Of Taunton*, 423 Mass. 390, 396 (1996); *see also Longval v. Commissioner of Correction*, 404 Mass. 325, 333 (1989) ("A direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the Act. . . . [W]e see no coercion . . . simply from the use of force by prison officials, authorized to use force, in order to compel a prisoner to do something he would not willingly do, even if it turns out that the official had no lawful right to compel the prisoner to take that action.").   Humphrey and Kelley's motions for summary judgment will therefore be granted as to Count 3.

2.      **Assault and Battery (Count 4)**

Plaintiff contends that Kelley's punch, and the level of force Kelley and Humphreys used in arresting him, amounted to an assault and battery under Massachusetts law.[20]  Assault and battery is the "intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another." *See Commonwealth v. McCan*, 277 Mass. 199, 203 (1932).  "An officer authorized to make an arrest may use such force as is reasonably necessary to effect the arrest."  *Sietins v. Joseph*, 238 F. Supp. 2d 366, 380 (D. Mass. 2003).  The standard for determining whether police officers are liable for assault and battery is "essentially the same" as the standard for determining if their use of force was reasonable for the Fourth Amendment excessive force claim.  *Id.*, citing *Dean v. City of Worcester*, 924 F.2d 364, 369 (1st Cir. 1991).  The motions for summary judgment as to Count 4 will therefore be denied.

3.      **False Imprisonment (Count 5)**

Plaintiff alleges that defendants did not have probable cause to arrest him, and therefore arresting him and holding him in custody until he posted bail constituted false imprisonment under Massachusetts law.  False imprisonment is the "intentional and unlawful confinement of a person, either directly or indirectly, of which the person confined is conscious or is harmed by such confinement." *Jonielunas v. City of Worcester Police Dep't*, 338 F. Supp. 2d 173, 177 (D. Mass. 2004). *See also Sietins*, 238 F. Supp. 2d at 381.  A police officer is liable for false imprisonment if he arrests, or causes the arrest, of the plaintiff, without probable cause. *See Jonielunas*, 338 F. Supp. 2d at 177.  This is essentially the same as the Fourth Amendment standard for unlawful

---

[20] Manning is not named as a defendant in Count 4.

arrest.  The motions for summary judgment as to Count 5 will therefore be denied.

### 4.     Malicious Prosecution (Count 6)

Plaintiff was charged in a criminal proceeding with trespassing, disturbing a public assembly, disorderly conduct, resisting arrest, and assault and battery on a police officer.  In February 2006, after a jury trial, he was acquitted on all charges.  Plaintiff now asserts a claim against the defendants for malicious prosecution.

To prevail on a claim for malicious prosecution, the plaintiff must show that defendants instituted criminal proceedings against him, with malice and without probable cause, and that the proceedings terminated in his favor.  *See Foley v. Polaroid Corp.*, 400 Mass. 82, 100 (1987) and *Santiago v. Fenton*, 891 F.2d 373, 387 (1st Cir. 1989).  None of the defendants dispute that they prosecuted plaintiff, or that he was acquitted.

The act of malicious prosecution begins with the submission, under oath, of a criminal complaint.  The criminal complaint against plaintiff was signed only by Kelley.  "[A] person need not swear out a criminal complaint in order to be held answerable for malicious prosecution." *Correllas v. Viveiros*, 410 Mass. 314, 318 (1991).  Someone who, in bad faith, provides information to a police officer that results in that officer submitting a complaint against another may also be liable.  *See Limone v. United States*, 497 F. Supp. 2d 143, 206 (D. Mass. 2007). Here, however, there is no evidence in the record that either Humphreys or Manning did anything to further the prosecution of plaintiff.  In particular, there is no evidence that Kelley relied on information from Humphreys or Manning when deciding whether to submit the criminal complaint.  Summary judgment will be granted to Humphreys and Manning as to the malicious prosecution claim.

20

With respect to the claim against Kelley, the only contested issues are the existence of probable cause and malice. The plaintiff has the burden to prove lack of probable cause; it cannot be merely inferred from the fact of acquittal. *See Muniz v. Mehlman*, 327 Mass. 353, 359 (1951). The plaintiff must prove malice by showing that defendant knew there was no probable cause for the prosecution, and that he acted with an improper motive. *See Foley*, 400 Mass. at 100. "Sometimes the lack of probable cause is so obvious that an inference of malice is warranted." *Id* at 101.

Where the suspect is prosecuted for multiple offenses, a claim of malicious prosecution can succeed for one or more of the offenses, even if it fails (because it is determined that the prosecutor had probable cause to prosecute) for the other offenses. *See Muniz v. Mehlman*, 327 Mass. 353, 360 (1951). A jury could therefore find for plaintiff on the malicious prosecution claim if any one of the five charges brought against him was pursued without probable cause and with malice.

The question of whether there is probable cause to prosecute is not same analysis as determining whether there was probable cause to arrest. The prosecutor may decide not to bring charges for some or all of the offenses for which a suspect was arrested. Similarly, an accused may be prosecuted even if he was never arrested for the alleged offense. Thus, even though at the time plaintiff was arrested the officers no longer had the authority to arrest him for his conduct in the stands, there still could be probable cause to prosecute him for that action.

The charge of trespassing under Mass. Gen. Laws ch. 266, § 120 was supported by probable cause, even under plaintiff's version of events. Plaintiff admits that he did not leave his seat for some time after Kelley first approached him in the stands and told him he was being

ejected.  Although plaintiff contends that he misunderstood and thought he was only being warned, that does not negate the existence of probable cause from the viewpoint of the officer. Summary judgment will therefore be granted as to that claim.

The charge of disturbing a public assembly under Mass. Gen. Laws ch. 272, § 40 presents a more difficult set of issues.  Any prosecution under § 40 is context-specific.  *See Commonwealth v. Orlando*, 371 Mass. 732, 735 (1977) (explaining that "hurling objects in an open and deserted field is probably permitted while hurling objects in a populated area may be proscribed.  Similarly, abusive language in some circumstances may constitute protected speech when uttered in a public store, but may be constitutionally proscribed when loudly uttered late at night in a residential neighborhood so that people in the privacy of their homes are unable to avoid the noise").  The "assembly" at issue here is the baseball game (including the crowd, not simply the players and umpires).  The context is a raucous playoff game.

Plaintiff admits that he shouted obscene words, accompanied by obscene gestures. Shouting, of course, is permissible at a baseball game, and could hardly be said to "disturb" the assembly.  Furthermore, plaintiff has considerable latitude under the First Amendment to use obscenities without being subject to prosecution.  *See, e.g., Cohen v. California*, 403 U.S. 15, 17 (1971) (defendant who wore jacket with words "Fuck the Draft" to a courthouse could not be prosecuted for disturbing the peace under § 415 of the California Penal Code).  Arguably—and particularly given the routine use of profanity, including profane chants, at professional sporting events—it is impossible to "disturb" a baseball game merely by shouting obscenities and using obscene gestures at an umpire.

The question, at bottom, is a matter not only of time and place, but also degree.  *See*

*Orlando*, 371 Mass. at 735; *Commonwealth v. Bohmer*, 374 Mass. 368, 373 (1978).  A baseball stadium during a playoff game is not like a church or a fine arts museum, but neither is it a free-fire zone in which everything is permissible.   Even a baseball game is capable of being disturbed by an fan shouting obscenities, depending on the particular context in which the event occurs.

The question before the Court is whether, assuming plaintiff's version of the facts is true, Kelley had probable cause to believe that plaintiff was disturbing a public assembly within the meaning of § 40.   Plaintiff admits that he engaged in loud and obscene conduct, and it is undisputed that some degree of disturbance occurred—the umpire on the field noticed plaintiff's behavior and instructed that he be ejected, and Red Sox security officials agreed.  That is enough to establish probable cause to prosecute under § 40, and accordingly summary judgment will be granted as to that claim.[21]

The charge of disorderly conduct under Mass. Gen. Laws ch. 272, § 53 appears to have encompassed two sets of events.  To the extent it was premised on plaintiff's behavior in the stands, the charge was supported by probable cause.  To the extent, however, that it was premised on plaintiff's behavior during his ejection and in the ambulance bay, it was not (again, accepting plaintiff's view of events).  According to plaintiff, nothing he did from the time Kelley approached him in the stands to the time of his arrest could be reasonably described as disorderly. Summary judgment will therefore be denied as to that claim.

The charges of resisting arrest under Mass. Gen. Laws ch. 268, § 32B and assault and battery on a police officer under Mass. Gen. Laws ch. 265, § 13D do not appear to have been

---

[21] Whether it is sufficient to prove a violation beyond a reasonable doubt is an issue that the Court need not decide.

supported by probable cause, again based on plaintiff's version of events.   Plaintiff contends that

he was peaceful and cooperative and did nothing to provoke the assault by the officers.   Summary

judgment will therefore be denied as to those claims.

Finally, in order to prevail on the malicious prosecution claim, plaintiff will have to prove

Kelley acted with malice.   Accepting plaintiff's version of events, there is sufficient evidence of

malice to survive summary judgment.   An improper motive for the prosecution may be inferred

from the evidence that Kelley otherwise acted with malice towards plaintiff—for example, by

punching him in the neck without reason or provocation.

To recap, summary judgment will be granted on the claim of malicious prosecution as to

defendants Humphreys and Manning, and as to defendant Kelley with respect to claims based on

the prosecution for trespassing and disturbing a public assembly.

### III.   Conclusion

For the foregoing reasons,

(1)  the motion of defendant Thomas Manning for summary judgment is

GRANTED as to the Massachusetts Civil Rights Act claim (Count 3) and

the malicious prosecution claim (Count 6), and otherwise DENIED;

(2)  the motion of defendant William J. Kelley for summary judgment is

GRANTED as to the Massachusetts Civil Rights Act claim (Count 3),

granted in part as to the claim for malicious prosecution (Count 6), to the

extent it was based on the prosecution for trespassing and disturbing a

public assembly, and otherwise DENIED; and

(3)  the motion of defendant Daniel Humphreys for summary judgment is

GRANTED as to the Massachusetts Civil Rights Act claim (Count 3) and the malicious prosecution claim (Count 6),  and otherwise DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
United States District Judge

Dated: March 31, 2009